**STATE of Minnesota, Appellant,**

v.

**Wayne Lawrence RUOHO, Respondent,**

**Jacqueline Francis Knutson, Respondent.**

Nos. A03–2015, A03–2016.

Court of Appeals of Minnesota.

Aug. 17, 2004.

Mike Hatch, Attorney General, St. Paul, MN 55101; and Donald F. Ryan, Crow Wing County Attorney, Kristine R. De-May, Assistant County Attorney, Brainerd, MN, for appellant.

Richard Sand, Daniel S. Adkins, Richard Sand, Adkins & Associates, P.A., St. Paul, MN, for respondent Ruoho.

Richard A. Bowen, Paul, MN, for respondent Knutson.

Considered and decided by WILLIS, Presiding Judge; LANSING, Judge; and HUDSON, Judge.

## OPINION

LANSING, Judge.

This is a consolidated appeal by the prosecution from a pretrial order suppressing evidence obtained during a warrant-authorized search of Wayne Ruoho and Jacqueline Knutson's rental unit and dismissing criminal charges. The state argues that the district court erred in concluding that the affidavit offered in support of the warrant failed to establish a nexus between the alleged crimes and the unit to be searched sufficient to support a finding of probable cause. Alternatively, the state argues that the district court erred in concluding that the good-faith exception to the exclusionary rule did not apply. By notice of review, Knutson chal-

lenges the legality of her off-premises seizure. Because we conclude that the affidavit offered in support of the warrant established a sufficient nexus between the alleged crimes and the unit to be searched, we reverse the district court's decision to suppress evidence obtained during the premises search and to dismiss charges based on that evidence. But because we conclude that Knutson was improperly seized under the limited authority to detain implied in the search warrant, we affirm the district court's decision to suppress evidence obtained as a result of the seizure.

### FACTS

A narcotics agent with the Lakes Area Drug Investigative Division obtained a search warrant on July 16, 2002, for rental unit 12 at Deacon's Lodge, a vacation resort. The warrant authorized the search of the premises and the people residing in the premises for evidence of drug dealing, including controlled substances, drug paraphernalia, address books, cash, records, and cellular phones.

The affidavit offered in support of the warrant indicated that on July 15, 2002, the agent was contacted by a Breezy Point police officer. The officer told the agent that the manager of Grand View Lodge, the company that manages Deacon's Lodge, had contacted him and told him that since June 23, 2002, Wayne Ruoho had been staying in Deacon Lodge's unit 3 with Jacqueline Knutson and their four children. According to the manager, people had reported seeing numerous vehicles coming to and leaving from unit 3. The agent indicated that based on his training and experience, he knew that high traffic volume is common at places where narcotics are distributed.

The affidavit also indicated that Ruoho had large amounts of cash on his person and paid only in cash. According to the agent, on July 2, a second Breezy Point police officer responded to a property-damage complaint involving Ruoho's daughters and saw Ruoho pay the victim $300 in cash. He also saw several $100 bills in Ruoho's wallet, possibly totaling $1,000. The agent indicated that based on his training and experience, he knew that people who distribute narcotics commonly have large amounts of cash in their possession and pay only in cash to conceal their identity.

Because unit 3 had been rented to another tenant starting on July 13, Ruoho and Knutson moved from unit 3 to unit 12 on July 12, 2002. According to the supporting affidavit, Ruoho and Knutson had refused housekeeping services during their stay in unit 3. But the housekeeper who cleaned unit 3 on July 12, presumably in preparation for the next tenant, saw a white powder on a mirror in one of the bedrooms. The Breezy Point police officer who walked through unit 3 after Ruoho and Knutson moved out stated that the unit smelled like marijuana and that he saw a leafy substance and seeds he believed to be marijuana. He also saw blankets over the windows and ink-pen parts throughout the unit. On a table in the basement, the officer saw white-powder residue. The agent indicated that based on his training and experience, he knew that people who distribute narcotics from rental units commonly refuse housekeeping services and keep the blinds drawn to conceal their activities. He also knew that people who consume narcotics in powder form often use mirrors or glass plates and hollow tubes from ink pens for snorting.

The affidavit also indicated that Ruoho had been convicted of narcotics charges in 1990, 1992, and 1993 and had served time for those convictions.

The warrant authorizing the search of unit 12 was issued on July 16 and was executed on the same day. The search started at approximately 2:23 p.m. and lasted approximately two hours. At the beginning of the search, officers found male and female adult clothing, documents with Knutson's name, and more than $36,000 in cash. The officers also found a one-month-old child in one of the bedrooms.

The agent learned that Knutson was at the Deacon's Lodge golf course. Relying on the warrant's authorization to search persons residing in unit 12, the agent asked an officer to locate Knutson and bring her back to the rental unit. Knutson was seized at approximately 2:45 p.m., and was brought back to unit 12. The agent then advised her that she was not free to leave until officers finished their investigation, and read her a *Miranda* warning. A search of Knutson's purse revealed four zip-lock-style bags containing approximately one gram of methamphetamine. After Knutson was seized, officers also found one gram of methamphetamine in the top drawer of a dresser.

Ruoho and Knutson were charged in separate complaints with child endangerment and two counts of fifth-degree controlled-substance crime. At the omnibus hearing, they challenged the issuance of the warrant for lack of probable cause. Knutson also challenged the seizure of her person. The district court concluded that the warrant was not supported by probable cause, reasoning that although the affidavit contained information linking the alleged crimes to unit 3, it set forth no specific facts establishing a nexus between the alleged crimes and unit 12. The court suppressed evidence obtained during the search, rejecting the state's claim that the evidence was admissible under the good-faith exception to the exclusionary rule.

The court reasoned that Minnesota courts have not recognized the good-faith exception and that, even if Minnesota courts had recognized the exception, the exception was inapplicable absent information supporting a probable-cause finding. The court also concluded that Knutson was unlawfully seized and suppressed evidence obtained as a result of the search of her purse. Because the charges were based on evidence obtained during the searches, the court dismissed the complaints. This appeal follows.

### ISSUES

I. Did the district court err in concluding that the affidavit offered in support of the warrant application failed to establish a nexus between the alleged crimes and unit 12 sufficient to support a finding of probable cause?

II. Did the district court err in concluding that Jacqueline Knutson was improperly seized?

### ANALYSIS

To prevail on a pretrial appeal, the state must show, as a preliminary matter, that the district court's order will have a critical impact on the outcome at trial unless reversed. *State v. Scott*, 584 N.W.2d 412, 416 (Minn.1998). When a complaint is dismissed for lack of probable cause, critical impact exists if the dismissal "effectively prevent[s] further prosecutions and [makes] reissuing of the complaints pointless." *State v. Aarsvold*, 376 N.W.2d 518, 520 (Minn.App.1985), *review denied* (Minn. Dec. 30, 1985). Ruoho and Knutson concede that the district court's ruling will have a critical impact on the prosecution.

**I**

The state first argues that the district court erred in concluding that the warrant application failed to provide a sufficient evidentiary basis from which a reasonable person could infer that incriminating evidence would be found in unit 12. We agree.

 A warrant application must establish probable cause for the issuing court to believe that a crime has been committed and that evidence of the crime will be found at the place to be searched (the so-called "nexus" requirement). *State v. Harris*, 589 N.W.2d 782, 788 (Minn.1999). When reviewing a determination of probable cause, the reviewing court's task is to determine whether the affidavit offered in support of the warrant, viewed as a whole, provides a substantial basis for a finding of probable cause. *State v. Zanter*, 535 N.W.2d 624, 633 (Minn.1995).

 We accord significant deference to the issuing judge's determination of probable cause, *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983), and will not invalidate a warrant by construing an affidavit in a hyper-technical—rather than a common-sense—fashion, *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). To avoid discouraging police from seeking review by a neutral and detached magistrate, doubtful or marginal cases are resolved in favor of upholding the warrant. *Harris*, 589 N.W.2d at 791. In sum, we view the issuing judge's determination flexibly, deferentially, and with an eye to encouraging rather than discouraging the use of warrants by law-enforcement officers.

 In determining whether probable cause to issue a search warrant exists, the task of the issuing judge is to make a practical, common-sense decision about whether the affidavit in support of the warrant sets forth sufficient competent evidence from which a person could infer that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Harris*, 589 N.W.2d at 788. The probable-cause standard does not require a showing that the inference is correct or more likely true than false. *Id.* at 789–90 (quotation omitted) (stating that "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity"); *see also United States v. Maestas*, 546 F.2d 1177, 1180 (5th Cir.1977) (stating that supporting affidavit "need not contain information providing certainty that the objects sought will be found as a result of the search"). Instead, the critical question is whether the totality of facts and circumstances described in the affidavit would justify a person of reasonable caution in believing that the items sought were located at the place to be searched. *Maestas*, 546 F.2d at 1180.

 For purposes of establishing probable cause to issue a search warrant, the required nexus between the place to be searched and the items to be seized need not rest on direct observation; instead, the nexus may be inferred from the totality of the circumstances, including the type of crime involved, the nature of the items sought, the extent of an opportunity for concealment, and reasonable assumptions about where a suspect would likely keep that evidence. *Harris*, 589 N.W.2d at 788; *see also Anthony v. United States*, 667 F.2d 870, 874 (10th Cir.1981) (rejecting argument that affidavit supporting warrant was insufficient "because nobody directly observed any evidence of the crime at [defendant's] residence"). The totality of the circumstances in this case permits an inference that the items to be seized would be found in unit 12, even though

nobody directly observed evidence of criminal activity in unit 12.

First, because Ruoho and Knutson were suspected of drug dealing, it was reasonable to assume that they would keep evidence of the alleged crimes in their place of residence. Federal courts have routinely upheld searches in the absence of direct observations or even an allegation of illegal activity in the home itself, when it was reasonable to assume that certain types of evidence would be kept at a suspect's home or residence. *See, e.g., United States v. Williams,* 974 F.2d 480, 482 (4th Cir.1992); *Maestas,* 546 F.2d at 1180.

In *Williams,* the affidavit offered in support of the warrant indicated only that a drug dealer with seven drug-related arrests, in whose house the police had found controlled substances three weeks earlier, had arranged for a one-week stay at a motel. 974 F.2d at 481. The court held that the affidavit established a sufficient "likelihood that drug paraphernalia would be found in the motel room," despite the lack of direct observations of drug activity at the motel. *Id.*

Similarly, in *Maestas,* the court held that an affidavit disclosing only that defendant was part of an ongoing "large-scale interstate counterfeiting ring" and had personally handled counterfeit checks established probable cause to search her residence, notwithstanding the lack of first-hand evidence that materials subject to seizure were in the residence. 546 F.2d at 1180. The court reasoned that "[d]efendant's apartment was the only logical place to conduct the search for the counterfeiting paraphernalia" and concluded that when it is reasonable to assume that certain types of evidence would be kept at a defendant's residence, it is not necessary for the affidavit to contain a recital that someone has personally observed evidence at the defendant's residence. *Id.*

As in *Williams* and *Maestas,* in this case it was reasonable for the issuing judge to assume that Ruoho and Knutson would keep drug-related contraband in unit 12, their new place of residence, despite the lack of first-hand evidence of drug activities in unit 12. The issuing judge could reasonably conclude, based on common experience, that a drug dealer, who, there was reason to believe, had been engaged in drug trafficking in unit 3 only days before the warrant was issued, was unlikely to have suspended his illegal operations after moving to unit 12. Unit 12 was therefore the logical place to conduct the search for incriminating evidence.

■ Second, Ruoho had an extensive record for drug dealing. Generally, evidence that a defendant is a long-time drug dealer contributes to an inference that a "likely place to seek to find incriminating items would be [his] residence," even though the probable-cause affidavit does not describe drug activity in the residence. *United States v. Feliz,* 182 F.3d 82, 88 (1st Cir.1999); *see also United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir.1993) (stating that required reasonable nexus between evidence to be seized and defendant's residence could be inferred from probable-cause affidavit establishing defendant's ongoing drug dealing); *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir. 1986) (stating that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live"). The supporting affidavit in this case established that Ruoho had been convicted of narcotics charges in 1990, 1992, and 1993 and had served time for those convictions. Ruoho's criminal record contributed to an inference that evidence of drug trafficking would be found in unit 12.

■ Third, while Ruoho and Knutson were residing in unit 3, people had ob-

served a large volume of traffic around the unit consistent with drug trafficking. Observations of a suspect's drug trafficking that occurs at a place other than the suspect's current residence can support probable cause for the issuance of a search warrant for the suspect's residence. In *United States v. Lamon*, 930 F.2d 1183, 1190 (7th Cir.1991), for example, evidence of drug trafficking found in defendant's car and temporary residence provided sufficient probable cause to search defendant's nearby permanent residence. In finding probable cause, the court relied on the affiant's statement that in his experience as a detective "drug dealers often hide money, drugs, and other incriminating evidence at their permanent residences." *Id.; see also United States v. Thomas*, 989 F.2d 1252, 1255 (D.C.Cir.1993) (finding probable cause to search residence of defendant arrested for narcotics trafficking on street); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir.1986) (finding probable cause for search of drug dealer's apartment even though defendant was not seen using the apartment). Similarly, evidence of drug trafficking in unit 3, Ruoho and Knutson's former residence, provided probable cause to search unit 12, their current residence.

The affidavit in support of the warrant contained allegations of drug trafficking in unit 3 and established that Ruoho and Knutson moved from unit 3 to unit 12 only four days before the warrant was issued. In light of Ruoho's record, the nature of the alleged crimes, and the nature of the evidence to be seized, the observations of activities that indicated drug trafficking in unit 3 provided probable cause for the issuance of a search warrant for unit 12, despite the lack of direct observations of criminal activity in unit 12. Although only one of these circumstances might not be sufficient, by itself, to establish probable cause to issue a search warrant, the totali-

ty of the circumstances sufficiently supported a finding of probable cause. Because we conclude that the affidavit was sufficient to establish probable cause, we do not address the state's alternative argument that the evidence is admissible based on the good-faith exception to the exclusionary rule.

## II

By notice of review, Knutson challenges the legality of her seizure, arguing that the seizure was not justified by the limited authority to detain implied in the search warrant and that the evidence obtained as a result of the seizure was, therefore, properly suppressed. We agree.

■■■ When reviewing pretrial orders on motions to suppress evidence, an appellate court may review the facts independently to determine, as a matter of law, whether the district court erred in suppressing, or not suppressing, the evidence. *State v. Harris*, 590 N.W.2d 90, 98 (Minn. 1999). The district court's factual findings will not be reversed, however, unless clearly erroneous or contrary to law. *State v. Gilbert*, 262 N.W.2d 334, 340 (Minn.1977).

■■■ It is now well established that, under certain circumstances, police may briefly detain occupants of private premises while they conduct a warrant-authorized search of the premises for contraband. *Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). In *Summers*, the defendant was walking down the front steps of his house just as officers approached the house to conduct a warrant-authorized search for narcotics. *Id.* at 693, 101 S.Ct. at 2589. The officers asked for Summers's assistance in gaining entry to the house and detained him, along with eight other occupants, while they searched the premises.

*Id.* The officers arrested Summers after finding illegal drugs in the basement. *Id.*

The Court held that the detention was proper, reasoning that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595 (footnote omitted). The Court balanced the intrusiveness of the detention of a person in his or her home against legitimate law-enforcement interests in (1) preventing flight should incriminating evidence be found, (2) minimizing the risk of harm to the officers from occupants suddenly becoming violent or trying to conceal or destroy evidence, and (3) facilitating the orderly completion of the search with the occupants' assistance. *Id.* at 702–03, 101 S.Ct. at 2594.

This court has held that an off-premises detention of a person named in a search warrant is reasonable when the detention satisfies the *Summers* balancing interests. *State v. Ailport*, 413 N.W.2d 140, 144 (Minn.App.1987), *review denied* (Minn. Nov. 18, 1987). In *Ailport,* we upheld the detention of a suspect who pulled into a motel parking lot at the same time officers were about to execute a search warrant for the room he had reserved. We concluded that the detention was justified because the officers reasonably believed that Ailport was dangerous, carried weapons, was involved in narcotics, and had a violent criminal history. *Id.* The intrusion was thus necessary to prevent flight, to prevent Ailport from alerting the occupants of the motel room of the police's presence, and to minimize the risk of harm to the officers conducting the search. *Id.*

Courts in other jurisdictions have also upheld off-premises detentions of persons named in a warrant, when the *Summers* balancing interests are satisfied. *See, e.g., State v. Thomas,* 603 So.2d 1382, 1383–84

(Fla.Dist.Ct.App.1992) (upholding detention of suspect who approached house being searched); *Fromm v. State,* 96 Md. App. 249, 624 A.2d 1296, 1299 (1993) (upholding detention of suspect who walked out of neighboring apartment building when his residence was about to be searched).

■ While *Summers* did not specify geographic distances by which to measure the intrusiveness of a detention, courts have recognized that the level of intrusiveness of an off-premises detention increases when the suspect is seized in a place other than the place subject to the search warrant. Off-premises detentions are thus more likely to be reasonable when the suspect is detained in a place that is in close proximity to the premises being searched. *See, e.g., United States v. Cochran,* 939 F.2d 337, 339 (6th Cir.1991) (seizure of person "a short distance" from his residence lawful under *Summers* ); *cf. United States v. Hogan,* 25 F.3d 690, 693 (8th Cir.1994) (holding that seizure of defendant's car and person three to five miles from home being searched not justified under *Summers* ); *United States v. Boyd,* 696 F.2d 63, 65 n. 2 (8th Cir.1982) (stating in dictum that *Summers* court "certainly did not sanction the search and seizure of residents who, at the time of the search, are several blocks from their home").

Courts have invalidated, as unduly intrusive, off-premises detentions close to the premises being searched, when the detentions do not seem to advance the law-enforcement interests enumerated in *Summers. See, e.g., Leveto v. Lapina,* 258 F.3d 156, 169 (3rd Cir.2001) (holding that detention of suspect in parking lot of business for which search warrant had been issued was unlawful because an investigation into possible tax evasion, without more, provided little reason to suspect that he posed a threat); *United States v. Sher-*

*rill,* 27 F.3d 344, 346 (8th Cir.1994) (refusing to extend *Summers* to detention occurring only one block away from premises to be searched, noting that distance from premises made intrusiveness greater and that "officers had no interest in preventing flight or minimizing the search's risk because [suspect] had left the area of the search and was unaware of the warrant").

■ We agree with Knutson that the seizure of her person was not justified under *Summers.* Unlike Summers, who was seized on his front steps, Knutson was seized one-half mile away from the search site. The intrusiveness of the detention was thus greater than that in *Summers.* And the increased intrusiveness did not advance the legitimate law-enforcement interests enumerated in *Summers.* First, Knutson's detention would not have prevented flight in the event incriminating evidence was found because she was not aware of the search. *See Hogan,* 25 F.3d at 693 (seizure not justified under *Summers* when defendant unaware that search about to be conducted); *United States v. Edwards,* 103 F.3d 90, 93 (10th Cir.1996) (stop and detention of defendant after he drove away from house for which police had obtained a search warrant not justified under *Summers* when defendant did not know warrant was being executed).

Second, Knutson's detention would not have minimized the risk of harm posed to the officers executing the warrant because there is no evidence that she was armed or otherwise dangerous, or that the officers considered her a threat to their safety. *Cf. Ailport,* 413 N.W.2d at 144 (off-premises stop and detention of suspect justified by officers' reasonable belief that suspect was armed and dangerous and had felony record and violent criminal history). Furthermore, unlike people who are inside or just outside of the premises being searched, a person who is one-half mile away from the premises poses no risk of harm to the officers conducting the search. *See Edwards,* 103 F.3d at 94 (concluding that suspect who left area and was unaware of search warrant posed no threat to officers executing warrant); *Hogan,* 25 F.3d at 693 (stating that defendant posed no risk of harm to agents from car three to five miles from premises being searched).

Finally, the fact that Knutson could have assisted the officers in conducting the search, the only remaining *Summers* justification, does not justify the intrusion. Officers knew that Knutson was staying in unit 12 and had no reason to believe that she would not return. They could have waited for her to return and enlisted her assistance with the search, if necessary. In any event, there is no indication that her presence was necessary for an orderly completion of the search. By the time Knutson was seized, officers had already gained entry to the unit and were proceeding with the search.

Because Knutson was improperly seized under the limited authority to detain implied in the search warrant, the district court properly suppressed the evidence obtained in the search of her purse.

## DECISION

The district court correctly concluded that Knutson was unlawfully seized under the limited authority to detain implied in the search warrant and properly suppressed the evidence obtained as a result of the seizure. But the district court erred in concluding that the affidavit submitted in support of the application for a search warrant failed to establish a nexus between unit 12 and the evidence to be seized sufficient to support a finding of probable cause.

**Affirmed in part and reversed in part.**